JAMES C. DAVIS, Director General,

*vs.*

## CENTRAL CONSTRUCTION CORPORATION.

*Railroad Company—Who is Passenger—Effect of Leaving
Train—Boarding Train in Motion.*

One does not cease to be a passenger because, upon the express
or implied invitation of the railroad company, he leaves the car,
though not at a regular stopping place, to take another car or
train for the purpose of continuing the journey or for any nec-
essary purpose incident to the journey.                          p. 94

In an action for personal injuries received by one while at-
tempting to board defendant's train at a point some distance
from a station, he having been told by the conductor of the next
preceding train, on which he was a passenger, to leave that
train, as it did not stop at his station, and to take the "train
behind," *held* that the evidence was sufficient to show that such
person was not only a passenger when told to leave the first
train, but was such at the time of the accident.          pp. 94-96

In an action for injuries received by a passenger while at-
tempting to board defendant's train, the question of the pas-
senger's alleged negligence in attempting to board a train while
in motion, *held* properly disposed of by prayers submitting the
question to the jury.                                           p. 96

The exclusion of questions asked a witness as to whether
trains were accustomed to stop to receive passengers at the place
where plaintiff was injured while attempting to board a train
*held* harmless in view of statements by this and another witness
that no trains stopped there, and that there were no facilities
for the reception of passengers.                          pp. 96, 97

*Decided July 26th, 1923.*

Appeal from the Superior Court of Baltimore City
(Frank, J.).

Action by the Central Construction Corporation, to the use of the Maryland Casualty Company, and to the use of Joel Harrison, against James C. Davis, Director General of Railroads. From a judgment for plaintiff, in the sum of $12,000, with interest from the date of the verdict, and costs, defendant appeals. Affirmed.

The cause was argued before Boyd, C. J., Briscoe, Thomas, Pattison, Urner, and Offutt, JJ.

*Ralph Robinson,* for the appellant.

*Clifton S. Brown* and *Austin J. Lilly,* for the defendant.

Pattison, J., delivered the opinion of the Court.

This is an appeal from a judgment recovered against James C. Davis, Director General of Railroads, in a suit by The Central Construction Corporation, to the use of The Maryland Casualty Company and one Joel Harrison, for personal injuries suffered by Harrison, caused by the alleged negligent operation of the defendant's train on the lines of the Pennsylvania Railroad Company.

In the trial of the case, three exceptions were taken to the rulings of the court; two upon the admission of evidence and one upon the prayers.

The court was asked by the defendant's first prayer to instruct the jury that there was no legally sufficient evidence to entitle the plaintiff to recover and to direct a verdict for the defendant. Because of this prayer, it will be necessary for us to state, somewhat in detail, the evidence in support of the plaintiff's claim.

On the 19th of July, and for some time prior thereto, Harrison was in the employment of the Central Construction Corporation, at Magnolia, Maryland, a station between Baltimore City and Aberdeen, and while so employed, he lived in the City of Baltimore. His work was at night and each evening he took the train out of Union Station for Magnolia, returning to Baltimore the next morning. He, however,

was transferred from night work to day work, and this made it necessary for him to leave Baltimore in the morning, and though he was familiar with the schedule of the work trains leaving Baltimore in the evening for Magnolia, he was not familiar with the morning schedule.

Harrison was to start his day work on July 19th, 1918, and in the early morning of that day he, with one Whitlinger, a co-laborer, went to Union Station to take a train for Magnolia.

Under his contract of employment his transportation was paid for by the Central Construction Corporation and, under its arrangement with the defendant, Harrison was not required to procure a ticket, the necessity therefor being obviated by his wearing a button by which he was designated as an employee of the company and one entitled to transportation upon the train of the defendant between the points mentioned.

Harrison testified that upon their arrival at the station he asked a trainman or "ticket checker" in the station who, at the time, was standing at the gate permitting passengers to decend the stairs leading from the station above to the platform below, from which the passengers boarded the cars, "where to get the train for Magnolia" and he with his companion were directed by him to a number of trains, any one of which they were told would take them to Magnolia. They took one of these trains, which soon filled up with passengers and, after waiting "quite a while," it pulled out. They had gone only a short distance from the city when two men came through the car "checking passengers." One of these wore a uniform. Before witness was reached by either of them he heard one of them say to a passenger in the car "Aberdeen only" and then called out in a loud voice "Aberdeen only." When the collector reached him, he asked him, the collector, "Don't this train stop at Magnolia?" and he was told that it did not, that it stopped at Aberdeen only. He then told the collector that he and Whitlinger were going to Magnolia, and the collector replied, "Well, you are on the wrong train; the

train is behind that goes to Magnolia." While this was being said the train stopped and the collector said, "Well, boy, you have to get off here and get the train behind." Both he and Whitlinger got off, and when they did so they found they were not at a station, but "in the middle of the road."

Harrison, who had ridden upon the road nearly every day during the six preceding months in going to and returning from his work, was familiar with the surroundings at the point where he had alighted from the train upon the order of the conductor, and he knew it to be only a short distance— several blocks"—from Back River station. So he with Whitlinger walked up to the station, as they thought it would be easier to board the train from the station than from the place where they were left upon the road. When they arrived at Back River station, they saw no one there except a policeman who was coming to the station from Back River Bridge, which was only a short distance away. When the policeman reached the station, Harrison asked him who was in charge of the station and he said, "I am," and he also said, "I am a Pennsylvania officer" and "I am looking after the bridge and also after the approach," and he said, "What is it you want?" and Harrison said, "We were put off a train—that workmen's train—we are making for Magnolia, and we were put off the workmen's train to get one behind, so we walked up to the station, thinking the train would probably stop at the station." The policeman said, "The train won't stop here, you will have to go right back to where you got off the other train; that is where the train will stop." Harrison said, when told this, "we hurried back and saw the train coming and when we got there the train just pulled in and stopped"; that at the time it stopped he was on a pathway running parallel with the tracks of the road and as he says "when the train stopped, I got off the pathway and made straight for the train and got on the train," and when asked "how far on did you get," he said, "I was on the train, up the steps, on one step with two feet, making to go up further; the first step was a high step, and I had two feet on the step

when the train gave a big jar and threw me and I got my leg cut off."

It is claimed by the defendant that this evidence is not legally sufficient to go to the jury as tending to show that Harrison was a passenger of the defendant at the time of the injury to him. It is upon this contention, which is raised by the defendant's first prayer and his special exceptions to the plaintiff's first and second prayers, that the defendant chiefly relies, although, as we understand him, he concedes in his brief that the relation of passenger and carrier existed between Harrison and the defendant from the time he entered Union Station for the purpose of taking a train until he reached the point where he was left upon the road; but because of his conduct thereafter in attempting to take the train that followed at that point, and not from Back River station, he ceased to be a passenger of the defendant.

In 6 *Cyc.* 541 it is said: "Where the relation of carrier and passenger is once established it continues until terminated by the voluntary act of the passenger, or the act of the carrier, under circumstances justifying its termination, and extends to the arrival of the passenger at his destination."

The relation of passenger does not cease when the passenger, upon the express or implied invitation of the company, leaves the car, though not at a regular stopping place, to take another car or train for the purpose of continuing the journey or for any necessary purpose incident to the journey. 10 *C. J.* 629; *Chicago and A. R. Company* v. *Winters,* 175 Ill. 293; *Killmyer* v. *Wheeling Traction Company,* 72 W. Va. 148, 48 L. R. A. (N. S.) 683.

The train boarded by Harrison at Union Station was to stop at Aberdeen, a station upon the defendant's road beyond Magnolia, but it seems it was not to stop at that place. This fact, however, was not known to Harrison until after the train had left Baltimore. He had been told, as he says, by one who, he had reason to believe, knew of the movements of the trains out of Union Station, and had the authority to direct him, that the train he took was one that would stop at Mag-

nolia. He had no ticket and none was required under
the arrangement between The Central Construction Company
and the defendant. Therefore he was in no sense a trespasser
upon the train, which he was later, before reaching the point
of destination, directed to leave to take the train that fol-
lowed. When told to get off the train he was simply directed
to "take the train behind," which he was told would stop at
Magnolia. It was with these directions only that he was
required to leave the train, and, until he had alighted there-
from, he did not know that he was not at a station.

Why the conductor did not stop the train at Back River
station which, by the evidence of the defendant, was not over
one-half mile from the place at which he stopped, is not
explained, although it is shown by the defendant's testimony
that the Magnolia train which followed would stop at that
station if flagged.

The plaintiff knew, however, that the place where he got
off the train was not far from Back River station, and inas-
much as the conductor had failed to tell him at what point
he should take the train that followed, he concluded that the
train he should take would stop at the station, and not at the
place where he was left on the road. He therefore walked up
the road to the station, and it was there that he saw the
policeman to whom reference has been made, who told him
that he was not only a policeman in charge of the bridge and
its approach, but that he also had charge of the station.

It is shown from the evidence that the station was little
used, and Harrison might well have thought that the duty of
agent at that station had been imposed upon the policeman in
addition to the care and protection of the bridge near by, and,
when told by him that the train would not stop at that station
but would stop where Harrison had left the train, and to go
back to such place, Harrison naturally returned to that place.

Harrison was nowhere contradicted in the evidence given
by him as to the conversation between him and the employee
of the defendant in Union Station, in relation to the train
Harrison should take for Magnolia. Nor was he contradicted

in his statement as to what occurred at the time he was required to leave the train, nor as to his conversation with the conductor, nor does the evidence show that Harrison at any time intended to abandon his journey.

Evidence was offered by the defendant to the effect that the policeman at Back River station, who was dead at the time of the trial, was not an agent at that station, and had no authority to direct Harrison as to what he should do in regard to taking the train for Magnolia. And evidence was also offered in contradiction of Harrison's statement that the train had stopped, at or near the place where he had been put off, at the time when he attempted to board it. The witness for the defendant testified that the train at the time was moving at a speed of six or eight miles an hour.

But, in determining the question under consideration, we must assume the truthfulness of Harrison's evidence and it, we think, was legally sufficient as tending to show that Harrison was not only a passenger when told to get off the train, but continued to be and was a passenger of the defendant at the time of the injury for which this suit was instituted.

The further contention is made that the plaintiff should not recover because of Harrison's alleged negligence, contributing to the accident, in attempting to board the train while it was said by the defendant to be in motion, but this question we think was properly disposed of by the prayers which submitted the finding of such fact to the jury.

We have carefully examined the other prayers of the defendant, and his special exceptions to the plaintiff's third prayer, as well as the plaintiff's prayers, and without discussing them, we will state that we have found no reversible error in the court's rulings thereon.

Two exceptions were taken to the rulings upon the evidence. They relate to two questions asked Wm. F. Coleman, telegraph operator at the tower located near the place where Harrison got off the train. They both, in effect, asked if passenger trains were accustomed to stop to receive passen-

gers at the place where Harrison attempted to board the train.

If the evidence here sought was admissible, we discover no possible harm that was done the defendant by its exclusion. The witness had previously stated that no train stopped there, and the same witness afterwards stated that at such place "there was no platform or any other similar arrangement for the reception of passengers." And in addition to this evidence, the conductor of the train which Harrison was attempting to take at the time of the accident testified that there were no station facilities at that point; that it was not a regular stop for trains and that no trains stopped there.

As we fail to discover any reversible error in the court's rulings in the trial of the case below, we will affirm the judgment appealed from.

*Judgment affirmed, with costs.*